**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF KANSAS**

```
UNITED STATES OF AMERICA,      )
                               )
                 Plaintiff,    )   CRIMINAL ACTION
                               )
v.                             )   No.  05-10102-01-MLB
                               )
DEANDRE A. FREEMAN,            )
                               )
                 Defendant.    )
                               )
```

**MEMORANDUM AND ORDER**

This case comes before the court on defendant's motion to suppress certain evidence seized from his residence. (Doc. 13.) The government responded (Doc. 16), and the court conducted an evidentiary hearing on August 8, 2005. Defendant's motion is DENIED for reasons set forth herein.

**I. FACTS**

Defendant, a convicted felon, was placed on parole in the state system on October 3, 2002. In order to be released from prison, defendant was required to sign an agreement entitled "Conditions of Post Release Supervision," which imposed various restrictions on his liberty. (Doc. 16 exh. A at 3.) The conditions provided, in relevant part, as follows:

> 2. Laws: I shall obey all federal and state laws, [and] municipal or county ordinances . . . .
> 3. Weapons: I will not own [or] possess . . . any firearms [or] ammunition . . . .
>
> . . . .
>
> 5. Narcotics/Alcohol: I will not illegally possess . . . any controlled substances, narcotics or other drugs . . . .

> . . . .
> 12. Search: I agree to subject to a search by parole officer(s) of my person, residence, and any other property under my control.

While on parole, defendant violated his curfew. As a consequence of that violation, he was reassigned from ordinary parole supervision under the Kansas Department of Corrections (KDOC) to intensive supervision. This higher level of parole supervision was administered by a private organization, the Day Reporting Center (DRC).[1] Among other things, parolees under the supervision of DRC were subject to random curfew checks and continuous GPS monitoring. The latter was accomplished by an ankle bracelet that worked in conjunction with either a GPS base unit at the parolee's residence, or a GPS capable cellular phone when the parolee was away from home.

Sometime in late September of 2004, DRC's Program Director, Charles Wolford, devised a plan to conduct a sweep of parolees under DRC supervision in order to check for curfew violations and to verify the operation and integrity of the GPS equipment. Wolford testified that, although some parolees were selected for the sweep for specific reasons, others, including defendant, were randomly chosen. Wolford relayed the plan to Warren Evans, a Special Enforcement Officer (SEO) with the KDOC. As Program Director, Wolford worked closely with Evans

---

[1] The Secretary of Corrections is authorized to employ DRC in this capacity by K.S.A. 75-5214(b)(1), which provides, in relevant part:
> The secretary may . . . contract with . . . any of the following to obtain parole services . . . .:
> (1) Any qualified individual, partnership, corporation or organization.

-2-

to coordinate DRC actions with state officials. Evans agreed to the plan, then contacted other law enforcement agencies to obtain additional personnel to assist in conducting the sweep. As a result, law enforcement officers from the Wichita Police Department, Sedgwick County Sheriff's Department, Kansas Highway Patrol, and the United States Marshals Service agreed to assist.

All these participants met at DRC on the evening of September 30, 2004, for a briefing conducted by SEO Evans and Wolford. Each officer was provided with copies of the "rap sheets" for the targeted parolees, as generated by KDOC's KASPER website.[2] Thereafter, they spent the evening performing the specified checks. In addition, Sgt. Carlos Walker testified that, pursuant to their conditions of parole, each parolee that he checked was asked to consent to a search of their residence. He further testified that each parolee he encountered prior to defendant did in fact consent to the search.

Defendant was the last parolee to be checked in the sweep. Officers arrived at his residence, 2308 S. Chautauqua, in Wichita, Kansas, at approximately 1:00 A.M. on October 1, 2004. The individuals initially on the scene included Officers Little, Shea, and Bryand, along with Sgt. Walker, all of whom were employed by the Wichita Police Department. They were accompanied by Ms. Bridgett Franklin, a contract parole officer employed by DRC. There was also testimony that two or three other officers, either sheriff's deputies or highway patrolmen, may have also been on the scene.

Officer Little approached the house and knocked on the door.

---

[2] http://docnet.dc.state.ks.us/kasper2/

Defendant answered, after which Little informed him that the police were there to perform curfew checks and equipment checks. Little then asked if he could come inside to explain "a little more" about why the officers were at defendant's home. Defendant testified that in response to Little's request, defendant said, "Sure. Come on in." At that point, Officers Little, Shea, and Bryand, as well as Sgt. Walker and Ms. Franklin all entered the residence.[3]

Defendant took a seat on the couch in the living room and Ms. Franklin promptly began to examine his GPS ankle bracelet. Officer Little informed defendant that the police were also there to perform a search of his residence for any parole violations. Defendant

---

[3] Defendant testified that the only person he saw when he invited Little into the house was Little himself. Defendant speculated that Ms. Franklin and the other officers must have been hiding around the side of the house. The court rejects that assertion. Credible testimony from Ms. Franklin and the other officers made clear that they were all present at the entrance to the home when Officer Little made contact with defendant. Moreover, after he became aware of all the individuals entering his home, defendant made know effort to clarify that he was consenting only to Little's entrance.

Indeed, the court credits little of defendant's testimony. He destroyed what little credibility he had when he testified that, immediately upon entering the house, all the officers other than Little fanned out and commenced searching the premises, including his bedroom. This testimony directly conflicted with his subsequent assertions, discussed infra, that when he was informed that the police intended to search his house, he immediately attempted to leave the living room and go to the bedroom to inform his girlfriend so she could get dressed. If the police were already in the bedroom, as defendant so testified, there was no need to inform her of their presence.

Likewise, his credibility waned when discussion turned to his involvement in a violent street gang known as the Junior Boys. Sgt. Walker testified that he worked extensively on local gang problems and that, as a result of prior investigations, he knew that defendant was a member of the Junior Boys. On cross-examination, defendant denied being a member of that gang. When the prosecutor noted that defendant had a tattoo that said "JB," defendant responded that these initials stood for "Just Business." To quote Lee Trevino's famous quip: "I was born at night, but not last night." The court is not so uninformed as to believe such nonsense.

-4-

responded that the police had no right to search his home, to which Little responded that they could because defendant was on parole. Defendant then became agitated. He raised his voice and, as Ms. Franklin characterized his conduct, began to "rant and rave." He stood up from the couch and proceeded toward his bedroom. At this point, Ms. Franklin testified that she became fearful for her safety, so she left the residence.

As he proceeded toward the bedroom, defendant stated that he needed to go inform his girlfriend that the police were going to search the house. Alarmed by this sudden escalation and defendant's attempts to reach the bedroom, Sgt. Walker directed Officer Little to "stay with him." Sgt. Walker testified that, based on his knowledge of defendant's involvement in a violent street gang, defendant's history of violent crime, and the sudden change in defendant's demeanor, he became concerned for the officers' safety when defendant attempted to reach the seclusion of the bedroom. Likewise, Officer Little testified that he also was concerned for the officers' safety based on the same combination of factors, although he had no personal knowledge of defendant's involvement in the Junior Boys. Both officers testified that their primary concern was that there might be a weapon in the bedroom. Accordingly, based on his own sense of danger and Sgt. Walker's order to "stay with" defendant, Officer Little intervened and stopped defendant from entering the bedroom. Little directed him back to the living room, but a quick glance into the bedroom revealed another person in the bed reaching into an adjacent dresser drawer.

After ensuring that defendant was returning to the living room,

Little proceeded to enter the bedroom; however, the occupant, a Ms. Maria Coleman was then exiting the room.  Little entered the bedroom anyway, and proceeded to search in and around the dresser, under the mattress, and under the bed.  Shortly after Little began his search, Sgt. Walker approached the entryway to the bedroom.  From this vantage point, he looked into the bedroom closet.  There, on the top shelf of the closet, in plain view, he saw what he immediately recognized as the butt or grip of a Glock pistol.  Since defendant was a convicted felon and parolee, Walker knew he was not allowed to have such a weapon.  Thus, Walker directed that defendant be taken into custody.

Based on the discovery of the weapon, police searched the rest of the residence.  In the same closet where the gun was found, they also discovered a bullet-proof vest.  In the basement of the home, they found stems or seeds from a marijuana plant. At some point after the gun was discovered, SEO Norman Coleman arrived on the scene.  However, it was unclear from the testimony exactly when he arrived or what role, if any, he had in directing any of the search efforts within the residence.

## II.  ANALYSIS

Defendant asks the court to suppress all the evidence seized from his home because it is the fruit of a warrantless search.  While the Fourth Amendment generally prohibits a warrantless search of the home, a parolee lacks the reasonable expectation of privacy that undergirds general Fourth Amendment law when he was paroled pursuant to a valid parole agreement that contains a provision allowing searches of his residence.  United States v. Tucker, 305 F.3d 1193, 1199 (10th Cir. 2002).  Nonetheless, "law enforcement officers are not completely

untethered from the Fourth Amendment when dealing with [parolees]." United States v. Trujillo, 404 F.3d 1238, 1242 (10th Cir. 2005) (citing Griffin v. Wisconsin, 483 U.S. 868, 875, 107 S. Ct. 3164, 97 L. Ed. 2d 709 (1987)). The Fourth Amendment's requirement is one of reasonableness, whatever the circumstances. See United States v. Lewis, 71 F.3d 358, 361 (10th Cir. 1995).

Our circuit has interpreted Supreme Court precedent as creating two avenues by which government officials may conduct a warrantless search of a parolee's home and still satisfy the Fourth Amendment's reasonableness standard. Tucker, 305 F.3d at 1200. The first method arises under the special needs exception to the warrant requirement. Lewis, 71 F.3d at 361 (citing Griffin, 483 U.S. at 873-74, 107 S. Ct. at 3168). A state's parole system creates a "special need" to supervise parolees. Id. Accordingly, a "search will satisfy the Fourth Amendment's reasonableness requirement to the extent parole agents carried it out pursuant to state law which itself satisfies the Fourth Amendment's reasonableness requirement." Id.

The second approach that will justify a warrantless search of a parolee's home is based not on the special needs exception to the warrant requirement, but on general Fourth Amendment principles. Tucker, 305 F.3d at 1200 (citing United States v. Knights, 534 U.S. 112, 122 S. Ct. 587, 590, 593, 151 L. Ed. 2d 497 (2001)). Under that method, a parolee who is bound by a valid search provision in his parole agreement has a diminished expectation of privacy that will justify a search of his home based on nothing more than reasonable suspicion. Id.

In this case, the government argues that the warrantless search

of defendant's home was justified under either method. (Doc. 16.) Turning first to the special needs exception, the court notes that while the Tenth Circuit has found that parolee/probationer search provisions under the law of other states are reasonable under the Fourth Amendment, the circuit has yet to pass on Kansas' system.[4] See, e.g., United States v. Cantley, 130 F.3d 1371 (10th Cir. 1997) (reviewing Oklahoma law); United States v. McCarty, 82 F.3d 943 (10th Cir. 1996) (reviewing Wyoming law); Lewis, 71 F.3d at 362 (reviewing Utah law).

While Kansas law regarding searches of parolees, including their homes, may well pass constitutional muster, the government's argument is a difficult one under the circumstances of this case. While it is undisputed that defendant had a valid parole agreement containing an unqualified search provision, the interpretation of the language in that provision is not so clear. Although the government argues that the provision makes defendant "subject to" a suspicionless search, that is not quite how the provision reads. Instead, the language of the search condition requires defendant "to subject to" a suspicionless search.

The government's interpretation of "to subject to" is that defendant was "subject to" a suspicionless search, regardless of whether he chose to consent. This interpretation directly conflicts with regulations and policies promulgated by the Secretary of Corrections. In one of his Internal Management Policies and Procedures (IMPP), the secretary stated:

---

[4] The courts have generally treated search provisions for probationers and parolees the same. Trujillo, 404 F.3d at 1242 n.1.

> All searches shall be lawful and, with the exception of pat-down and plain view searches, special enforcement officers are the only personnel authorized to conduct a more extensive search of the offender's person or property.
>
> . . . .
>
> If the Special Enforcement Officer has <u>reasonable suspicion</u> that evidence of a condition violation can be found on the person, or in the property in possession of the offender, the officer may conduct a search of the person or property without a warrant.

(Doc. 13 at 5-6.)[5]  Such a statement of policy may be considered state law for purposes of evaluating the state's system for warrantless parolee searches under the special needs exception. See Cantley, 130 F.3d 1371, 1375 (evaluating special needs exception based on the Oklahoma Probation and Parole Manual).  Under this policy, the only persons authorized to perform warrantless searches of parolees or their property are SEOs, and only on the basis of reasonable suspicion.  By contrast, the government's argument is that, in spite of this clear directive to the contrary, a search could be conducted without any degree of suspicion and without the involvement of an SEO.[6]  As stated previously, the special needs exception requires that the search be conducted "pursuant to state law which itself satisfies the Fourth Amendment's reasonableness requirement." Lewis, 71 F.3d

---

[5] Unfortunately, neither party provided a citation to the actual IMPP from which this quotation originates.  Nonetheless, the government conceded at the hearing that this quote was accurately taken from a genuine IMPP.  Accordingly, the court will assume that the quote is an accurate reflection of the rules established by the secretary.

[6] The only SEO on the scene was SEO Coleman, and he did not arrive until at least after the gun had been discovered, and possibly after the vest and drugs had been discovered.

at 361. Since this search did not comply with state law, as set forth in the Secretary of Corrections' IMPPs, the court need not consider whether the underlying state system comports with the Fourth Amendment's standards of reasonableness.

Alternatively, the government argues that this search was justified from its inception under general Fourth Amendment principles of reasonableness, as set forth in Knights. (Doc. 16 at 4-6.) Given, however, that the government had no basis to suspect defendant of any wrongdoing prior to entering his home, the government argues that Knights allows for suspicionless searches of parolees' residences. Id. at 6. This argument is based on the statement in Knights that a warrantless search of a parolee's residence requires "no more than reasonable suspicion." Knights, 534 U.S. at 121, 122 S. Ct. at 592. The Supreme Court specifically noted that the minimum level of suspicion, if any, required to justify a warrantless search of a parolee's home remained an open question after Knights. Id. at 120 n.6, 122 S. Ct. at 592. While other circuits have filled this gap by finding that suspicionless searches are permissible if supported by a valid parole agreement that provides as such (see Doc. 16 at 6-7 & n.3 (collecting cases)), the Tenth Circuit appears to have resolved the question to the contrary.

In Tucker, the court characterized and extrapolated Knights as follows:

> Because probationers subject to a search provision in their probation agreement have a diminished expectation of privacy, and because the state has a greater interest in ensuring probationers do not violate the law, the Court concluded that a probation search was permissible so long as supported by reasonable suspicion,

-10-

> regardless of the motivation for the search. See [Knights, 122 S. Ct.] at 591-93.
> Tucker's parole agreement contained a search provision authorizing officers to search his home for a violation of any parole condition. One of those parole conditions was that he comply with all federal, state, and municipal laws. This case is thus materially indistinguishable from Knights in which the probationer's probation agreement authorized searches for any law enforcement purposes. See Knights, 122 S.Ct. at 590. Therefore, even assuming that the search was a subterfuge for a law enforcement investigation, <u>it was permissible under general Fourth Amendment principles if the officers had reasonable suspicion that contraband was located at Tucker's residence or that a crime had taken place</u>. As in Knights, the officers' motivation is irrelevant.

Tucker, 305 F.3d at 1200 (emphasis added). Strictly construed, the underlined statements from Tucker indicate that the Tenth Circuit has answered the question left open in Knights by concluding that reasonable suspicion is required to conduct a warrantless search of a parolee's home. Moreover, requiring reasonable suspicion to search a parolee's home is consistent with Trujillo's statement that "law enforcement officers are not completely untethered from the Fourth Amendment when dealing with [parolees]." Trujillo, 404 F.3d at 1242. If, as the government suggests, no degree of particularized suspicion is necessary to justify a search of a parolee's home, government officials would indeed be "untethered" from the Fourth Amendment. Accordingly, the court concludes that reasonable suspicion was required to justify a warrantless search of defendant's home. Since no degree of particularized suspicion existed when the officers entered his residence, their entry was not justified under Knights.

Be that as it may, the court concludes that the actions of the officers were nonetheless permissible. The Fourth Amendment was not

-11-

implicated when the officers merely knocked on defendant's door and spoke to him from outside his home. It is undisputed that Officer Little then asked for permission to enter the home, to which defendant unequivocally responded, "Sure. Come on in." There is not even the slightest hint that defendant's response was coerced or anything other than a knowing, voluntary consent to have the officers enter his residence. Next, Little informed defendant that the officers intended to search his home. The mere statement of this intent did not amount to a Fourth Amendment violation, even if carrying out that intent, as expressed, would have been a violation.[7] In response to Little's statement, defendant became uncooperative and attempted to leave the living room and enter his bedroom. When Officer Little intervened, he obtained a vantage point from which he could see another unidentified person in the bedroom reaching into a nearby dresser.

At this point, the officers in the residence possessed several pieces of information that objectively raised their degree of particularized suspicion, both as to criminal activity and officer safety. They were in the home of a convicted felon on state parole, who was also known to be a member of a violent street gang. Upon hearing that the police intended to search his house, this man became agitated and attempted to leave police presence to reach his bedroom.

---

[7] While the testimony appeared clear that Little told defendant that the officers were going to search his home, Sgt. Walker testified that the teams had obtained written consent to search from all the other parolees they checked that evening. That fact, coupled with the additional fact that SEO Coleman was on his way to defendant's residence implies that, had the situation not escalated so quickly, the officers probably would have sought defendant's consent to perform the search, and that it would have been done under the supervision of SEO Coleman, thereby complying with terms of the parole agreement and the secretary's IMPPs.

And, police knew that another person was in the bedroom, possibly placing an object in or retrieving an object from a dresser adjacent to the bed. Under these circumstances, the court finds that police had reasonable suspicion to believe that there may have been something in that bedroom that would amount to contraband or otherwise constitute a violation of defendant's parole conditions. Based on the officers' testimony, the most pressing concern was that there might be a weapon in the bedroom.[8] Thus, even though police lacked reasonable suspicion to search defendant's residence when they first arrived, subsequent events gave rise to reasonable suspicion, at least as to defendant's bedroom.[9] Armed with that reasonable suspicion, defendant's status as a parolee, and the fact that his parole agreement contained a valid search provision, the police could enter defendant's bedroom without a warrant. See Tucker, 305 F.3d at 1200.

Once in the bedroom, Sgt. Walker found the handgun in plain view

---

[8] The government urges that the bedroom search was justified as a protective sweep under Maryland v. Buie, 494 U.S. 325, 110 S. Ct. 1093, 108 L. Ed. 2d 276 (1990). (Doc. 16 at 8.) In support of that argument, the government cites United States v. Hauk, 412 F.3d 1179 (10th Cir. 2005). However, Hauk involved a protective sweep incident to arrest. Id. at 1184. The Tenth Circuit has read Buie as only permitting a protective sweep in the arrest context. See United States v. Garza, 125 Fed. Appx. 927, 930-31 (10th Cir. Feb. 2, 2005) (unpublished) (reviewing Tenth Circuit case law on this question and concluding that prior circuit law limits Buie to arrests); but see id. at 933-34 (Tymkovich, J., concurring) (observing that the Fifth Circuit has extended Buie to non-arrest situations, and suggesting that might be appropriate for the Tenth Circuit as well). For now, the law in this circuit appears to preclude a protective sweep in a non-arrest situation such as the present case.

[9] The court offers no opinion as to whether this level of suspicion was sufficient to justify a search of the entire house.

on a closet shelf.[10]  A law enforcement officer may lawfully seize an item without a warrant if three conditions are satisfied: "(1) the officer was lawfully in a position from which to view the object seized in plain view; (2) the object's incriminating character was immediately apparent--i.e., the officer had probable cause to believe the object was contraband or evidence of a crime; and (3) the officer had a lawful right of access to the object itself." United States v. Sparks, 291 F.3d 683, 690 (10th Cir. 2002).  As already discussed, Sgt. Walker was lawfully in the bedroom.  The handgun was immediately incriminating because Walker knew that defendant was a convicted felon and a parolee.  Thus, his possession of a gun was a federal crime, a state crime, and a parole violation.  Finally, there was nothing that precluded Walker's lawful access to the gun.  Accordingly, the gun was properly seized under the plain view doctrine.

At this point, any doubts as to whether the officers possessed reasonable suspicion to search the entire residence evaporated.  "Once there was reason to believe that [defendant] violated his parole agreement, there is, by definition, reasonable suspicion to support a search of his residence to ensure compliance with the conditions of his parole."  Trujillo, 404 F.3d at 1245 (internal quotation marks omitted).  Therefore, law enforcement officers were justified in search the remainder of his home and seizing any prohibited items,

---

[10] Defendant focuses on the actions of Officer Little, claiming that his full-blown search of the dresser, the mattress, and the area under the bed was unconstitutional. However, Little's search revealed nothing incriminating.  The only incriminating item was found by Sgt. Walker, was in plain view, and its discovery was not aided or made possible by Little's actions. Accordingly, the parameters of Little's search are irrelevant.

-14-

including the bullet-proof vest and the marijuana stems at issue here. Defendant's motion to suppress this evidence is accordingly DENIED.

IT IS SO ORDERED.

Dated this  11th   day of August 2005, at Wichita, Kansas.

>                              s/   Monti Belot
>                              Monti L. Belot
>                              UNITED STATES DISTRICT JUDGE